## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CÉSAR CASTILLO, INC., individually and on behalf of all those similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>FOUGERA PHARMACEUTICALS, INC.; NOVARTIS AG; SANDOZ, INC.; TARO PHARMACEUTICAL INDUSTRIES, LTD.; TARO PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICALS USA INC.; and SUN PHARMACEUTICAL INDUSTRIES, INC.,<br><br>                    Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff César Castillo, Inc. ("Plaintiff") files this civil action pursuant to Section 1 of the Sherman Act, Section 4 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for damages, costs of suit, and other relief as may be just and proper, on behalf of itself and a class of those similarly situated ("Class" as defined below) against defendants Fougera Pharmaceuticals, Inc., Sandoz, Inc., Novartis AG, Taro Pharmaceutical Industries, Ltd., Taro Pharmaceuticals USA, Inc., Teva Pharmaceuticals USA Inc., and Sun Pharmaceutical Industries, Inc., for Defendants' conspiracy to artificially fix, raise, maintain and/or stabilize the prices of generic fluocinonide ("Fluocinonide"). Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows.

## INTRODUCTION

1.       Beginning no later than June of 2014, the major U.S. manufacturers of Fluocinonide conspired to artificially fix, raise, maintain and/or stabilize the prices of Fluocinonide sold throughout the United States, in violation of Section 1 of the Sherman Act.

2.       Plaintiff seeks to represent a Class consisting of all persons in the United States who purchased Fluocinonide directly from Defendants during the period beginning June 18, 2014, and through the present.

3.       Fluocinonide is a corticosteroid used to treat a variety of skin conditions (*e.g.*, psoriasis, eczema, dermatitis, allergies, rash). Fluocinonide reduces the swelling, itching, and redness that can occur in these types of conditions. It also can heal the rough, scaly patches on the skin seen with psoriasis. For the purposes of this Complaint, Fluocinonide is defined as generic Fluocinonide topical cream .05%, topical ointment .05%, topical gel .05%, and .05% emollient cream.

4.      Beginning in June of 2014, Defendants substantially increased the price of Fluocinonide, in unison. Those increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Fluocinonide in the United States. The agreement was facilitated by Defendants' discussions at meetings held by the Generic Pharmaceutical Association ("GPhA"), in Orlando, Florida in February 2014, and in North Bethesda, Maryland in June 2014.

5.      Before June of 2014, Fluocinonide prices in the U.S. were stable. Beginning that month, Defendants collusively raised those prices by extraordinary amounts. In particular:

a.      **Fluocinonide 0.05% cream:** Between June 18, 2014 and August 20, 2014, the average price for 15g Fluocinonide 0.05% cream increased by 127%; the average price for 30g Fluocinonide 0.05% cream increased by 212%; and the average price for 120g Fluocinonide 0.05% cream increased by 630%. Between June 18, 2014 and October 22, 2014, the average price for 60g Fluocinonide 0.05% cream increased by 341%.

b.      **Fluocinonide 0.05% ointment:** Between June 18, 2014 and August 20, 2014, the average price for 15g Fluocinonide 0.05% ointment by 127%; and the average price for 60g Fluocinonide 0.05% ointment increased by 246%. Between July 23, 2014 and August 20, 2014, the average price for 30g Fluocinonide 0.05% ointment increased by 211%.

c.      **Fluocinonide 0.05% gel:** Between June 18, 2014 and August 20, 2014, the average price for 60g Fluocinonide 0.05% gel increased by 132%. Between July 23, 2014 and November 19, 2014, the average price for 15g Fluocinonide 0.05% gel increased by 110%.

d.      **Fluocinonide 0.05% emollient cream:** Between June 18, 2014 and December 17, 2014, the average price for 60g Fluocinonide 0.05% emollient cream increased by 414%. Between June 2014 and November 19, 2014, the average price for 15g

Fluocinonide 0.05% emollient cream increased by 97%. Between June 18, 2014 and August 20, 2014, the average price for 30g Fluocinonide 0.05% emollient cream increased by 206%.

6.     Defendants' price increases were substantially in lockstep. Fluocinonide prices remained at supra-competitive levels throughout the Class Period.

7.      Defendants' price increases were contrary to their respective unilateral self-interests. Like any generic drug, Fluocinonide is a commodity product. Therefore, absent a conspiracy or factors justifying a price increase, if any manufacturer substantially increased the price of Fluocinonide, its competitors would not be expected to increase their prices by similar amounts, but would be expected seek to sell more Fluocinonide to that manufacturer's customers. In other words, it would be contrary to any manufacturer's unilateral self-interest to substantially increase its price for Fluocinonide unless it had agreed with the other manufacturers that they would do the same.

8.     The only factors that would have justified such price increases would have been a significant increase in the costs of making Fluocinonide, a significant decrease in the supply of Fluocinonide, or a significant increase in demand for Fluocinonide. None of those transpired in 2014. Absent these factors, substantial price increases would have been contrary to each Defendant's unilateral self-interest absent the existence of a cartel.

9.     Defendants' price increases have resulted in scrutiny from government authorities.

10.     No later than November 3, 2014, the United States Department of Justice ("DOJ") opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas several generic drug manufacturers, including all Defendants and/or their affiliates.

3

11.     On December 14, 2016, the DOJ unsealed criminal informations against two former senior executives of generic drug manufacturer Heritage Pharmaceuticals Inc. for violations of Section 1 of the Sherman Act for their roles in conspiracies to fix prices, rig bids, and allocate customers for generic drugs Glyburide and Doxycycline Hyclate DR. *See United States v. Glazer*, No. 16-cr-506 (E.D. Pa.) and *United States v. Malek*, No. 16-cr-508 (E.D. Pa.). The DOJ is reportedly preparing additional cases involving other generic drugs.

12.     On December 15, 2016, the attorneys general of several states filed a civil action alleging federal antitrust violations against Mylan and other sellers of the generic drugs Glyburide and Doxycycline Hyclate DR. *See State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056 (D. Conn.) (the "State AG Action").

13.     According to the complaint in the State AG Action, the information developed through the AGs' investigation (which is ongoing) uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for generic pharmaceuticals, beyond Glyburide and Doxycycline Hyclate DR. The complaint alleges that the conspiracies implicate numerous manufacturers.

## JURISDICTION AND VENUE

14.     This action arises under section 1 of the Sherman Act, 15 U.S.C. § 1 and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from Defendants' conspiracy to restrain trade in the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that affected the interstate trade and commerce discussed below has been carried out in this District.

16.     During the Class Period, Defendants sold and shipped Fluocinonide in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

17.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of Fluocinonide throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

18.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for

Fluocinonide, which unreasonably restrained trade and adversely affected the market for Fluocinonide.

19.     Defendants' conspiracy and unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased Fluocinonide manufactured by Defendants, including Plaintiff and the members of the Class.

**PARTIES**

**A.    Plaintiff**

20.     Plaintiff César Castillo, Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business and headquarters located at Bo. Quebradas Arena, Rd. #1 Km. 26.0, Rio Piedras, Puerto Rico, 00926.  During the Class Period, Plaintiff purchased Fluocinonide directly from one or more Defendants.  As a direct and proximate result of Defendants' collusion, manipulative conduct, and unlawful acts, Plaintiff was injured in its business or property.

**B.    Defendants**

21.     Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation headquartered in Melville, New York. Fougera is a specialty dermatology generic pharmaceutical company, and a wholly-owned subsidiary of Defendant Sandoz, Inc. Fougera manufactures and sells Fluocinonide throughout the United States.

22.     Defendant Sandoz, Inc. is a Colorado corporation headquartered in Princeton, New Jersey. Sandoz manufactures products at locations in Hicksville and Melville, New York, and manufactures and sells Fluocinonide throughout the United States. Sandoz, Inc. is a subsidiary of Defendant Novartis AG. Sandoz, Inc. acquired Fougera in July 2012 for $1.5 billion, making Sandoz, Inc. the top generic dermatology medicines company globally and in the

6

United States. Fougera and Sandoz, Inc. are referred to collectively as "Sandoz" in this Complaint.

23.     Defendant Novartis AG ("Novartis") is a Swiss company based in Basel, Switzerland. During the Class Period, Novartis sold Fluocinonide to customers in this District and other locations in the United States through Sandoz. Novartis maintains an office in this District in New York, New York.

24.     Defendant Sun Pharmaceutical Industries Inc. ("Sun") is a New Jersey corporation with its headquarters in Cranbury, New Jersey, and is the U.S. subsidiary of parent company Sun Pharmaceutical Industries Ltd., located in Mumbai, India. In September 2010, Sun acquired a controlling stake in Defendant Taro Pharmaceutical Industries, Ltd.

25.     Defendant Taro Pharmaceutical Industries, Ltd. ("Taro Israel") is an Israeli company with its principal place of business in Haifa, Israel.

26.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro USA") is a New York corporation with its principal place of business in Hawthorne, New York. Taro USA is a wholly-owned subsidiary of Defendant Taro Israel. In this Complaint, Sun, Taro USA and Taro Israel are referred to collectively as "Taro." During the Class Period, Taro sold Fluocinonide products to customers in this District and throughout the United States.

27.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli company located in Petach Tokva, Israel. During the Class Period, Teva sold Fluocinonide products to customers in this District and throughout the United States. Teva maintains an office in this District at 145 W. 57th Street, New York, NY 10019.

7

28. Various other entities and individuals currently unknown to Plaintiffs may have also participated as co-conspirators in the acts complained of and/or performed acts that aided and abetted and/or otherwise furthered the conspiracy's objectives and unlawful conduct alleged herein.

## CLASS ALLEGATIONS

29. Plaintiff brings this action on behalf of itself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a class (the "Class") defined as follows:

> All persons who or entities which purchased Fluocinonide directly from any of the Defendants, or any current or former subsidary or affiliate thereof, or any co-conspirator, in the United States, during the period from and including June 18, 2014 through the present. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

30. The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable.

31. Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and other Class members have all sustained damage in that, during the Class Period, they purchased Fluocinonide at artificially maintained, non- competitive prices, established by the Defendants' actions in connection with the violations alleged herein.

32. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has purchased Fluocinonide directly from at least one of the Defendants. Plaintiff has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class Members.

33. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. The common legal and

factual questions, which do not vary among Class Members include, but are not limited to, the following:

        (a)      Whether and to what extent Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the prices of Fluocinonide in the United States;

        (b)      The scope and duration of the contract, combination, or conspiracy, the identity of its participants, and the acts undertaken in its furtherance;

        (c)      The effect of the contract, combination, or conspiracy on the prices of Fluocinonide in the United States during the Class Period;

        (d)      Whether and to what extent Defendants' conduct resulted in supracompetitive prices for Fluocinonide;

        (e)      Whether and to what extent Defendants' conduct injured Plaintiff and other Class Members; and

        (f)      The appropriate measure of damages sustained by Plaintiff and other Class Members.

34.      A class action is superior to any other method for the fair and efficient adjudication of these issues, as joinder of all members is impracticable. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## FACTUAL ALLEGATIONS

### A.     Overview of Generic Drug Market

#### 1.     Generic drugs lead to lower prices

35.     Generic drugs typically provide consumers with a lower cost alternative to brand-name drugs while providing the same treatment. Specifically:

> A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific evaluations. By law, a generic drug product must contain the identical amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.[1]

36.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[2]

37.     Generic versions of brand drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act (discussed in more detail below).

---

[1]  FDA, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm.

[2]  *Id.*

38.     The FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]"[3] A Federal Trade Commission study reached the same conclusion finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[4] Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year.[5] As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers:[6]

---

[3]  FDA, Generic Competition and Drug Prices, *available at* http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.

[4]  FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-costconsumers-billions-federal-trade-commission-staff.

[5]  *Id.*

[6]  *See, e.g.,* Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare,* HEALTH AFFAIRS, 26, no. 3 (2007):790-799.



Generic Competition and Drug Prices

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

39.     A mature generic market, such as the markets for doxycycline and digoxin, has several generic competitors. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[7] Over time, generics' pricing nears the generic manufacturers' marginal costs.

40.     Generic competition usually enables purchasers to (a) purchase generic versions of the brand drug at a substantially lower price than the brand drug, and/or (b) purchase the brand drug at a reduced price. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and

---

[7]  *See, e.g.*, FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998).

federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[8]

### 2. How generic drugs come to market

41.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. § 355(a), (b).

42.    The Hatch-Waxman Act, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[9] Hatch-Waxman allows a manufacturer seeking approval to sell a generic version of a brand drug to file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's NDA, and must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug. This establishes that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns generic drugs that are therapeutically equivalent to and are of the same dosage strength and form

---

[8]  Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[9]  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

as their brand counterpart an "AB" rating.

43.     Most drug companies that want to introduce a generic drug to the market file an ANDA with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs. The only exception is for so-called "authorized generics," which are generics launched under the brand company's NDA but typically priced like other generics.

44.     Generic drugs that are bioequivalent to a brand drug (sometimes called the "Reference Listed Drug" or "RLD") are assigned a Therapeutic Equivalence Code ("TE Code"). An oral generic drug product will be coded "AB" if bioequivalence is demonstrated. The purpose of this coding is to allow users to determine whether the FDA has evaluated a particular approved product as therapeutically equivalent to other pharmaceutically equivalent products and to provide information on the basis of the FDA's evaluations. Thus, generic drugs that are AB-rated to the brand share the same safety and efficacy characteristics and are the same dosage size and form.

### B.     Defendants' Opportunities for Collusion

45.     The DOJ is reportedly looking closely at trade associations. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the DOJ's investigation, the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[10]

46.     Generic drug manufacturers attend industry trade shows throughout the year, including those hosted by the GPhA, the National Association of Chain Drug Stores, the

---

[10]  Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma, Aug. 7,  2015 (available at http://bit.ly/2hHE6iK).

Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing.

47.     At these conferences and trade shows, Defendants' representatives have opportunities to interact with each other directly, and discuss their respective businesses and customers. Organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities, are held concurrent with many of these conferences and trade shows, and provide further opportunities for conspirators to meet with competitors outside of the usual business setting. Generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

48.     In addition to these conferences and trade shows, representatives of generic drug manufacturers gather separately, in smaller groups, allowing them to further meet face-to-face with their competitors and discuss their businesses. A large number of generic drug manufacturers, including two of the Defendants, have offices in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them more frequent opportunities to meet and collude. In fact, high-level executives of Defendants gather periodically for what at least some of them refer to as "industry dinners."

49.     As a result of these various interactions, Defendants' sales and marketing executives are well aware of their competition and, more importantly, each other's current and future business plans. This familiarity and these opportunities often lead to agreements among competitors to fix prices or to allocate given markets, so as to avoid price competition.

15

50.    Defendants routinely communicate and share information with each other about their bids and pricing strategies. This can include forwarding bid packages received from their customers (e.g., Requests for Proposal) to competitors, either on their own initiative, or at the competitor's request.

51.    Defendants also share information regarding the terms of their contracts with customers, including terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to impose higher prices or more onerous terms on their customers, to the ultimate detriment of consumers.

### C.    Fluocinonide Prices Increased Dramatically During the Class Period.

52.    Before June 2014, the price of Fluocinonide was stable. Beginning in June 2014, Defendants effected several dramatic price increases for Fluocinonide in unison. The increases were the result of Defendants' agreement to increase pricing and restrain competition among themselves. Defendants met at GPhA events twice in 2014 before implementing their price increases.

53.    The GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." *See* http://www.gphaonline.org/about/the-gpha-association/. GPhA was formed in 2000 from the merger of three industry trade associations: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

54.    According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." *See* http://bit.ly/2i8kCon. GPhA further claims that, "[b]y becoming part of GPhA, you can

participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections." *Id*.

55.     Representatives of Sandoz, Taro and Teva attended the GPhA annual meeting in Orlando, Florida on February 19- 21, 2014.

56.     Representatives of Sandoz, Taro and Teva also attended the GPhA's CMC Workshop in North Bethesda, Maryland on June 3 and June 4, 2014 ("GPhA CMC Meeting")

57.     These meetings, among other contacts among Defendants, provided Defendants with opportunities to collude and, on information and belief, Defendants agreed to increase their prices for Fluocinonide at these meetings.

58.     National Average Drug Acquisition Cost ("NADAC") data as of November 23, 2016 demonstrate that Defendants have maintained prices for Fluocinonide in all of its relevant forms at supracompetitive prices.

59.     Moreover, a report issued in August of 2016 by the United States Government Accountability Office found that Fluocinonide topical cream .05%, topical ointment .05%, and topical gel .05% all "experienced an extraordinary price increase" in 2014 and 2015.

60.     There were no justifications for these abrupt price increases, which were not necessitated by increased manufacturing costs, or research and development costs. There were no shortages of Fluocinonide in the United States, nor did demand for Fluocinonide suddenly increase.

61.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, along with the reasons for those shortages, and their expected duration. Defendants made no such reports with respect to Fluocinonide during the Class Period.

62.     In a report dated April 21, 2015, Sector & Sovereign Research concluded that: "A plausible explanation is that generic manufacturers . . . are cooperating to raise the prices of products whose characteristics (low sales due to either very low prices or very low volumes) accommodate price inflation." *See US Generic Inflation Continues in 1Q15*, Apr. 21, 2015 (available at http://bit.ly/2i0NkJT).

63.     These price increases had a substantial impact on consumers. Letters from members of Congress to generic drug manufacturers included the following:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."

Ltr. from Sen. Sanders and Rep. Cummings to A. Bedrosian (Lannett Pres. And CEO), Oct. 2, 2014 (available at http://bit.ly/2iaYFaM).

64.     Another report focused specifically on Fluocinonide:

> Analysis of federal data shows that the price pharmacies pay for generics over the past year has soared by as much as 17,700 percent in one case. One in 11 generic drugs have more than doubled in cost for pharmacies over the past year. So when your pharmacist tells you that the fluocinonide [Fluocinonide] cream (a topical steroidal cream used to treat psoriasis) you previously paid less than $30 to get will cost you nearly $200, it's because the cost to the pharmacy from Teva (manufacturer) has now increased to well over $150.

Wayne Howard, *You Mean It Wasn't Obamacare?*, Lincoln Herald, Dec. 31, 2014 (available at http://bit.ly/2hnZBr0).

65.     Defendants' price-fixing scheme dramatically improved their profits. For example, on its Q2 2014 earnings call with industry analysts on November 10, 2014, Michael Kalb, Taro's Chief Financial Officer reported that "[n]et sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130 basis points expansion in our gross margins to 79%." *See Taro Pharmaceutical Industries' (TARO) CEO Kal Sundaram on Q2 2014 Results - Earnings Call Transcript* (available at http://bit.ly/2hnX2oY) (registration required).

66.     On September 14, 2016, the Economic Times of India reported that "[w]hile Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases." Divya Rajagopal, *Taro Under Antitrust Scanner for Price Hike*, Sep. 13, 2016 (available at http://bit.ly/2hIrrvW).

### D.     Government Responses to Rising Generic Drug Prices

67.     On November 20, 2014, United States Senator Bernie Sanders' Senate Subcommittee on Primary Health and Aging held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?"

68.     No later than November 3, 2014, as noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas several generic drug manufacturers, including all Defendants and/or their affiliates. The DOJ is now conducting a wide-ranging criminal

investigation into collusion among generic drug companies. According to Bloomberg News, the investigation encompasses more than 12 companies and at least 24 generic drugs.

69.    A source at the Policy and Regulatory Report says "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect 'to move from one drug to another in a similar cascading fashion.'" Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FiercePharma, Jul. 10, 2015 (available at http://bit.ly/2ibw3hE).

70.    Some Defendants confirmed having been served with grand jury subpoenas. On May 28, 2016, Sun reported the following:

> One of the company's US subsidiaries, Sun Pharmaceutical Industries Inc. (SPII), has received a grand jury subpoena from the United States Department of Justice (DoJ), anti-trust division seeking documents from SPII and its affiliates relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding sales of generic pharmaceutical products and certain other related matters.

*See Sun Pharma declines after subsidiary gets summons from US antitrust division*, Business Standard, May 30, 2016 (available at http://bit.ly/2iy7B6K).

71.    On September 9, 2016 Taro disclosed in an SEC filing that "Taro Pharmaceuticals, U.S.A., Inc. … as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products." Eric Palmer, *Taro Pharma execs subpoenaed by DOJ over generics pricing*, FiercePharma, Sept. 12, 2016 (available at http://bit.ly/2cjxecT).

72. According to *Bloomberg News*, Sandoz confirmed that it received a subpoena from the DOJ in March 2016, and added that it believed the subpoena was related to "the industry-wide investigation into generic drug pricing in the U.S."[11]

73. On November 15, 2016, Teva disclosed the following in a submission to the SEC:

> On June 21, 2016, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products . . . . On July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations.

Teva Pharmaceutical Indus., Ltd., Form 6-K (Nov. 15, 2016) (available at http://bit.ly/2i8Ltks).

**E.    The Fluocinonide Market is Conducive to an Effective Conspiracy.**

74. Characteristics specific to the market for Fluocinonide in the United States make it conducive to a price-fixing agreement.

75. **The Market is Highly Concentrated:** The domestic Fluocinonide market is highly concentrated. Three manufacturers substantially control the entire market.

76. **The Market has High Barriers to Entry:** Conspiracies that raise product prices above competitive levels will, all things being equal, attract to the relevant market new firms seeking to benefit from supracompetitive prices. But when barriers to entering the market are significant, new firms are less likely to do so. Barriers to entry thereby facilitate the maintenance of a price-fixing conspiracy. Significant barriers limit entry into the Fluocinonide market. Fluocinonide production is capital-intensive.

---

[11] *See* Ari Alstedter, *NYPD Union Goes After Drug Prices Amid DOJ Pharma Probe*, Nov. 17, 2016 (available at http://bloom.bg/2i7Td5Y).

77. **Demand for Fluocinonide is Inelastic:** "Elasticity" is a term that describes the sensitivity of demand for a product to changes in its price. Demand is "inelastic" if an increase in its price results in a relativity small decline in demand for the product. Demand is inelastic in markets—such as the Fluocinonide market—in which customers cannot readily substitute alternative products, or do without a product altogether.

78.  For competitors to profit from colluding to raise prices above competitive levels, demand for their product must be relatively inelastic at competitive prices. Otherwise, increased prices would reduce their sales as customers abandoned their products. Inelastic demand thus facilitates collusion.

79. Demand for Fluocinonide is highly inelastic. A meaningful increase in the price for Fluocinonide would not induce purchasers to switch to another product in significant numbers, as the there is no reasonable substitute for Fluocinonide available at a lower price.

80. **Fluocinonide is a Fungible Product:** Because all Fluocinonide is the same, price is the predominant factor driving customers' purchasing decisions. The interchangeability of Fluocinonide products facilitated Defendants' conspiracy by enabling coordination on price that would be more difficult if Defendants sold products that varied in composition and/or performance.

81. **Defendants Had Ample Opportunities To Meet and Conspire:** Defendants had numerous opportunities to conspire in person under the guise of legitimate business meetings. In particular, Defendants are members of the GPhA, and attend other industry events and meetings, which provide opportunities to communicate. Defendants' representatives regularly attended meetings of GphA and meetings of other trade associations during the Class Period. The DOJ is reportedly investigating trade associations like GPhA as a potential avenue

for facilitating collusion among generic drug manufacturers as part of its ongoing investigation into anticompetitive pricing activities in generic drug markets.

## ANTITRUST INJURY

82.     During the Class Period, Plaintiff and Class Members purchased Fluocinonide directly from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for Fluocinonide than they would have and thus suffered substantial damages. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

83.     Because Defendants' unlawful conduct has successfully restrained competition in the market, Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

84.     Defendants' anticompetitive conduct is ongoing, and as a result Plaintiff and the Class continue to pay supracompetitive prices for Fluocinonide.

## CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

85.     Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

86.     Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

87.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

88.    As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another as to the output and pricing of Fluocinonide in the United States. This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

89.    Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

90.    The conspiracy had its intended effect, as Defendants benefited from their collusion and the restraint of competition, both of which artificially inf1ated the prices of Fluocinonide, as described herein.

91.    As a result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for Fluocinonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

92.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.    Certification of the action as a Class Action pursuant to Federal Rule of Civil

24

Procedure 23, and appointment of Plaintiff as Class Representative and its counsel of record as

Class Counsel;

B.     Permanent injunctive relief that enjoins Defendants from violating the antitrust

laws and requires them to take affirmative steps to dissipate the effects of their violations;

C.     That acts alleged herein be adjudged and decreed to be unlawful restraints of trade

in violation of the Sherman Act, 15 U.S.C. § 1;

D.     A judgment against Defendants, jointly and severally, for the damages sustained

by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other

monetary relief provided by applicable law, including treble damages;

E.     By awarding Plaintiff and Class Members pre-judgment and post-judgment

interest as provided by law, and that such interest be awarded at the highest legal rate from and

after the date of service of the Complaint in this action;

F.     The costs of this suit, including reasonable attorney fees; and

G.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial,

pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.


Dated: December 27, 2016                         Respectfully submitted,


                                                 _____/s/ Linda P. Nussbaum_____
                                                 Linda P. Nussbaum
                                                 NUSSBAUM LAW GROUP, P.C.
                                                 1211 Avenue of the Americas
                                                 40th Floor
                                                 New York, NY 10036-8718
                                                 (917) 438-9189
                                                 lnussbaum@nussbaumpc.com

Juan R. Rivera Font
JUAN R. RIVERA FONT LLC
Ave. González Giusti #27, Suite 602
Guaynabo, PR 00968
(787) 751-5290
juan@riverafont.com

*Counsel for Plaintiff César Castillo, Inc.*
*and the Proposed Direct Purchaser Class*