**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CÉSAR CASTILLO, INC., individually and
on behalf of all those similarly situated,

                Plaintiff,

v.

LANNETT COMPANY, INC., MYLAN
PHARMACEUTICALS INC., SANDOZ,
INC., and NOVARTIS AG,

                Defendants.

Civil Action No.  16-cv-09949

**<u>AMENDED CLASS ACTION</u>**
**<u>COMPLAINT</u>**

JURY TRIAL DEMANDED

Plaintiff César Castillo, Inc. ("Plaintiff") files this civil action pursuant to Section 1 of the Sherman Act, Section 4 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for damages, costs of suit, and other relief as may be just and proper, on behalf of itself and a class of those similarly situated ("Class" as defined below) against defendants Lannett Company, Inc. ("Lannett"), Mylan Pharmaceuticals Inc. ("Mylan"), Sandoz, Inc. ("Sandoz"), and Novartis AG ("Novartis"), for Defendants' conspiracy to artificially fix, raise, maintain and/or stabilize the prices of generic levothyroxine ("Levothyroxine"). Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows.

## **INTRODUCTION**

1.      Beginning no later than November 2013, the major U.S. manufacturers of Levothyroxine conspired to artificially fix, raise, maintain and/or stabilize the prices of Levothyroxine sold throughout the United States, in violation of Section 1 of the Sherman Act.

2.      Plaintiff seeks to represent a Class consisting of all persons in the United States who purchased Levothyroxine directly from Defendants during the period beginning November 21, 2013 and continuing through the present.

3.      Levothyroxine is used primarily to treat thyroid hormone deficiency, or hypothyroidism. Levothyroxine is on the World Health Organization's list of essential medicines, and many patients for whom it is prescribed take it for the remainder of their lives. In has repeatedly appeared on lists of the most prescribed generic drugs. As of June 2015, it was the most prescribed generic drug in the United States, and it accounted for 2.7% of all generic drug prescriptions.

4.    Beginning in November 2013, Defendants increased the price of Levothyroxine, in unison, by over 200%. Those increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Levothyroxine in the United States. The agreement was facilitated by Defendants' discussions at meetings held by the Generic Pharmaceutical Association ("GPhA"), including a meeting in Bethesda, Maryland in October 2013.

5.    Before November of 2013, Levothyroxine prices in the U.S. were stable. After the October 2013 meeting, Defendants Lannett, Mylan, and Sandoz collusively raised those prices. Within weeks after that meeting, average prices for Levothyroxine began to increase by extraordinary amounts. Each of the twelve available dosage units of Levothyroxine nearly doubled in price in November 2013, and continued to increase—substantially in lockstep—during the Class Period, with the prices of the respective dosage units rising between 185 and 231% between November 14, 2013 and October 15, 2014. Those prices remained at supra-competitive levels throughout the Class Period.

6.    Defendants' price increases were contrary to their respective unilateral self-interests. Like any generic drug, Levothyroxine is a commodity product. Therefore, absent a conspiracy or factors justifying a price increase, if any manufacturer substantially increased the price of Levothyroxine, its competitors would not be expected to increase their prices by similar amounts, but would be expected seek to sell more Levothyroxine to that manufacturer's customers. In other words, it would be contrary to any manufacturer's unilateral self-interest to substantially increase its price for Levothyroxine unless it had agreed with the other manufacturers that they would do the same.

7.     The only factors that would have justified such price increases would have been a significant increase in the costs of making Levothyroxine, a significant decrease in the supply of Levothyroxine, or a significant increase in demand for Levothyroxine. None of those transpired in 2013.

8.     Defendants' price increases have resulted in scrutiny from government authorities.

9.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman Elijah Cummings sent letters to several generic drug manufacturers, including Defendants Lannett and Mylan, asking for detailed information regarding their generic drug price increases. On November 20, 2014, Senator Sanders' Senate Subcommittee on Primary Health and Aging held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" Lannett President and Chief Executive Officer Arthur Bedrosian was invited to testify at that hearing, but did not do so.

10.    No later than November 3, 2014, the United States Department of Justice ("DOJ") opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas several generic drug manufacturers, including Defendants Mylan, Sandoz and Lannett. The DOJ is now conducting a wide-ranging criminal investigation into collusion among generic drug companies. According to Bloomberg News, the investigation encompasses more than 12 companies and at least 24 generic drugs.

11.    Defendants Lannett, Sandoz and Mylan have confirmed having received subpoenas from the DOJ. On October 7, 2016, Mylan disclosed in a filing with the U.S. Securities and Exchange Commission that on September 8, 2016, the DOJ "subpoenaed a company subsidiary, a senior executive and other employees about alleged price fixing and also

executed multiple search warrants related to its probe." Mylan further disclosed that the DOJ is

seeking "additional information relating to the marketing, pricing and sale of" several generic

drugs, "and any communications with competitors about such products."

12.    According to *Bloomberg News*, Sandoz confirmed that it received a subpoena

from the DOJ in March 2016, and added that it believed the subpoena was related to "the

industry-wide investigation into generic drug pricing in the U.S."[1]

13.    Lannett disclosed the following on November 4, 2016, in its Form 10-Q for the

quarter ended September 30, 2016:

> In fiscal year 2015 and 2016, the Company and certain affiliated individuals each
> were served with a grand jury subpoena relating to a federal investigation of the
> generic pharmaceutical industry into possible violations of the Sherman Act. The
> subpoenas request corporate documents of the Company relating to corporate,
> financial and employee information, communications or correspondence with
> competitors regarding the sale of generic prescription medications and the
> marketing, sale, or pricing of certain products, generally for the period of 2005
> through the dates of the subpoenas.

*Id.* (available at http://bit.ly/2i80dji).

14.    On December 15, 2016, the attorneys general of several states filed a civil action

alleging federal antitrust violations against Mylan and other sellers of the generic drugs

Glyburide and Doxycycline Hyclate DR. *See State of Connecticut v. Aurobindo Pharma USA,

Inc.*, No. 16-cv-2056 (D. Conn.) (the "State AG Action").

15.    According to the complaint in the State AG Action, the information developed

through the AGs' investigation (which is ongoing) uncovered evidence of a broad, well-

coordinated and long-running series of schemes to fix the prices and allocate markets for generic

---

[1]  *See* Ari Alstedter, *NYPD Union Goes After Drug Prices Amid DOJ Pharma Probe*, Nov. 17,
2016 (available at http://bloom.bg/2i7Td5Y).

pharmaceuticals, beyond Glyburide and Doxycycline Hyclate DR. The complaint alleges that the conspiracies implicate numerous manufacturers, including Defendant Mylan.

## JURISDICTION AND VENUE

16.     This action arises under section 1 of the Sherman Act, 15 U.S.C. § 1 and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from Defendants' conspiracy to restrain trade in the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

17.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that affected the interstate trade and commerce discussed below has been carried out in this District.

18.     During the Class Period, Defendants sold and shipped Levothyroxine in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

19.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of Levothyroxine throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business

5

or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

20.      By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for Levothyroxine, which unreasonably restrained trade and adversely affected the market for Levothyroxine.

21.      Defendants' conspiracy and unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased Levothyroxine manufactured by Defendants, including Plaintiff and the members of the Class.

## PARTIES

### A.      Plaintiff

22.      Plaintiff César Castillo, Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business and headquarters located at Bo. Quebradas Arena, Rd. #1 Km. 26.0, Rio Piedras, Puerto Rico, 00926. During the Class Period, Plaintiff purchased Levothyroxine directly from one or more Defendants. As a direct and proximate result of Defendants' collusion, manipulative conduct, and unlawful acts, Plaintiff was injured in its business or property.

**B.**    <u>**Defendants**</u>

23.    Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation headquartered in Philadelphia, Pennsylvania. Lannett manufactures and sells Levothyroxine throughout the United States.

24.    Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a West Virginia corporation with its headquarters in Morgantown, West Virginia. Mylan manufactures and sells Levothyroxine throughout the United States.

25.    Defendant Sandoz, Inc. is a Colorado corporation headquartered in Princeton, New Jersey. Sandoz is a wholly-owned subsidiary of Defendant Novartis AG. Sandoz manufactures products at locations in Hicksville and Melville, New York, and manufactures and sells Levothyroxine throughout the United States.

26.    Defendant Novartis AG ("Novartis") is a Swiss company based in Basel, Switzerland. During the Class Period, Novartis sold Levothyroxine to customers in this District and other locations in the United States through Sandoz. Novartis maintains an office in this District at at 230 Park Ave, 21st Floor, New York, NY 10169. In the remainder of this Complaint, Sandoz and Novartis will be referred to collectively as "Sandoz."

27.    Various other entities and individuals currently unknown to Plaintiffs may have also participated as co-conspirators in the acts complained of and/or performed acts that aided and abetted and/or otherwise furthered the conspiracy's objectives and unlawful conduct alleged herein.

<u>**CLASS ALLEGATIONS**</u>

28.    Plaintiff brings this action on behalf of itself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a class (the "Class") defined as follows:

All persons who or entities which purchased Levothyroxine directly from any of the Defendants, or any current or former subsidiary or affiliate thereof, or any co-conspirator, in the United States, during the period from and including November 21, 2013 through the present. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

29.     The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable.

30.     Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and other Class members have all sustained damage in that, during the Class Period, they purchased Levothyroxine at artificially maintained, non- competitive prices, established by the Defendants' actions in connection with the violations alleged herein.

31.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has purchased Levothyroxine directly from at least one of the Defendants. Plaintiff has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class Members.

32.     Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. The common legal and factual questions, which do not vary among Class Members include, but are not limited to, the following:

(a)     Whether and to what extent Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the prices of Levothyroxine in the United States;

(b)     The scope and duration of the contract, combination, or conspiracy, the identity of its participants, and the acts undertaken in its furtherance;

(c)     The effect of the contract, combination, or conspiracy on the prices of

Levothyroxine in the United States during the Class Period;

(d)    Whether and to what extent Defendants' conduct resulted in

supracompetitive prices for Levothyroxine;

(e)    Whether and to what extent Defendants' conduct injured Plaintiff and

other Class Members; and

(f)    The appropriate measure of damages sustained by Plaintiff and other Class

Members.

33.    A class action is superior to any other method for the fair and efficient

adjudication of these issues, as joinder of all members is impracticable. The damages suffered

by many Class Members are small in relation to the expense and burden of individual litigation,

and therefore, it is highly impractical for such Class Members to individually attempt to redress

the wrongful anticompetitive conduct alleged herein.

## FACTUAL ALLEGATIONS

### A.    Overview of Generic Drug Market

#### 1.    Generic drugs lead to lower prices

34.    Generic drugs typically provide consumers with a lower cost alternative to brand-

name drugs while providing the same treatment. Specifically:

> A generic drug is the same as a brand name drug in dosage, safety, strength, how
> it is taken, quality, performance, and intended use. Before approving a generic
> drug product, FDA requires many rigorous tests and procedures to assure that the
> generic drug can be substituted for the brand name drug. The FDA bases
> evaluations of substitutability, or "therapeutic equivalence," of generic drugs on
> scientific evaluations. By law, a generic drug product must contain the identical
> amounts of the same active ingredient(s) as the brand name product. Drug
> products evaluated as "therapeutically equivalent" can be expected to have equal
> effect and no difference when substituted for the brand name product.[2]

---

[2] FDA, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/Drugs/
ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm.

35.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[3]

36.     Generic versions of brand drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act (discussed in more detail below).

37.     The FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]"[4] A Federal Trade Commission study reached the same conclusion finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[5] Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year.[6] As more

---

[3] *Id.*

[4] FDA, Generic Competition and Drug Prices, *available at* http://www.fda.gov/AboutFDA/ CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.

[5] FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-costconsumers-billions-federal-trade-commission-staff.

[6] *Id.*

generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers:[7]



Generic Competition and Drug Prices

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

38.    A mature generic market, such as the markets for doxycycline and digoxin, has several generic competitors. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[8] Over time, generics' pricing nears the generic manufacturers' marginal costs.

---

[7]  *See, e.g., * Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare,* HEALTH AFFAIRS, 26, no. 3 (2007):790-799.

[8]  *See, e.g.*, FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office,

39.     Generic competition usually enables purchasers to (a) purchase generic versions of the brand drug at a substantially lower price than the brand drug, and/or (b) purchase the brand drug at a reduced price. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[9]

### 2.     How generic drugs come to market

40.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. § 355(a), (b).

41.     The Hatch-Waxman Act, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.[10] Hatch-Waxman allows a manufacturer seeking approval to sell a generic version of a brand drug to file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's NDA, and

"How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998).

[9] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[10] *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug. This establishes that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns generic drugs that are therapeutically equivalent to and are of the same dosage strength and form as their brand counterpart an "AB" rating.

42.     Most drug companies that want to introduce a generic drug to the market file an ANDA with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs. The only exception is for so-called "authorized generics," which are generics launched under the brand company's NDA but typically priced like other generics.

43.     Generic drugs that are bioequivalent to a brand drug (sometimes called the "Reference Listed Drug" or "RLD") are assigned a Therapeutic Equivalence Code ("TE Code"). An oral generic drug product will be coded "AB" if bioequivalence is demonstrated. The purpose of this coding is to allow users to determine whether the FDA has evaluated a particular approved product as therapeutically equivalent to other pharmaceutically equivalent products and to provide information on the basis of the FDA's evaluations. Thus, generic drugs that are AB-rated to the brand share the same safety and efficacy characteristics and are the same dosage size and form.

### B.      Defendants' Opportunities for Collusion

44.     The DOJ is reportedly looking closely at trade associations. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the DOJ's investigation, the DOJ is looking closely

"at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[11]

45.    Generic drug manufacturers attend industry trade shows throughout the year, including those hosted by the GPhA, the National Association of Chain Drug Stores, the Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing.

46.    At these conferences and trade shows, Defendants' representatives have opportunities to interact with each other directly, and discuss their respective businesses and customers. Organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities, are held concurrent with many of these conferences and trade shows, and provide further opportunities for conspirators to meet with competitors outside of the usual business setting. Generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

47.    In addition to these conferences and trade shows, representatives of generic drug manufacturers gather separately, in smaller groups, allowing them to further meet face-to-face with their competitors and discuss their businesses. A large number of generic drug manufacturers, including two of the Defendants, have offices in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them more frequent opportunities to

---

[11]  Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma, Aug. 7,  2015 (available at http://bit.ly/2hHE6iK).

meet and collude. In fact, high-level executives of Defendants gather periodically for what at least some of them refer to as "industry dinners."

48.     As a result of these various interactions, Defendants' sales and marketing executives are well aware of their competition and, more importantly, each other's current and future business plans. This familiarity and these opportunities often lead to agreements among competitors to fix prices or to allocate given markets, so as to avoid price competition.

49.     Defendants routinely communicate and share information with each other about their bids and pricing strategies. This can include forwarding bid packages received from their customers (e.g., Requests for Proposal) to competitors, either on their own initiative, or at the competitor's request.

50.     Defendants also share information regarding the terms of their contracts with customers, including terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to impose higher prices or more onerous terms on their customers, to the ultimate detriment of consumers.

### C.     Levothyroxine Prices Increased Dramatically During the Class Period.

51.     Before November 2013, the price of Levothyroxine was stable. Beginning in November 2013, Defendants effected several dramatic price increases for Levothyroxine in unison. The increases were the result of Defendants' agreement to increase pricing and restrain competition among themselves. Defendants met one or more times before implementing their price increases, including at GPhA events.

52.     The GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."

*See* http://www.gphaonline.org/about/the-gpha-association/. GPhA was formed in 2000 from the merger of three industry trade associations: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

53.    According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." *See* http://bit.ly/2i8kCon. GPhA further claims that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections." *Id*.

54.    Representatives of each of the Defendants attended the GPhA Fall Technical Conference in Bethesda, Maryland on October 28-30, 2013, and the GPhA annual meeting in Orlando, Florida on February 19- 21, 2014.

55.    These meetings, among other contacts among Defendants, provided Defendants with opportunities to collude and, on information and belief, Defendants agreed to increase their prices for Levothyroxine at these meetings.

56.    Shortly after the October 2013 meeting, average prices for Levothyroxine increased by extraordinary amounts. In November 2013 alone, according, each of the twelve available dosage units of Levothyroxine nearly doubled in price. Levothyroxine tablets increased by the following amounts between November 14, 2013 and October 15, 2014:

| Tablet Size (in micrograms) | Percentage price increase |
|---|---|
| 25 | 208 |
| 50 | 225 |

| Tablet Size (in micrograms) | Percentage price increase |
|:---:|:---:|
| 75 | 214 |
| 88 | 216 |
| 100 | 212 |
| 112 | 208 |
| 125 | 219 |
| 137 | 197 |
| 150 | 231 |
| 175 | 224 |
| 200 | 220 |
| 300 | 185 |

57.     There were no justifications for these abrupt price increases, which were not necessitated by increased manufacturing costs, or research and development costs. There were no shortages of Levothyroxine in the United States, nor did demand for Levothyroxine suddenly increase.

58.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, along with the reasons for those shortages, and their expected duration. Defendants made no such reports with respect to Levothyroxine during the Class Period.

59.     These price increases had a substantial impact on consumers. Letters from members of Congress to generic drug manufacturers included the following:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to

operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."

Ltr. from Sen. Sanders and Rep. Cummings to A. Bedrosian (Lannett Pres. And CEO), Oct. 2,

2014 (available at http://bit.ly/2iaYFaM).

60.    Unprecedented generic drug price increases also have a detrimental impact on

direct purchasers of the drugs:

One factor that squeezed retailers' profit margins was the generic price inflation that roiled the pharmacy market, beginning in 2013 and extending through 2014 into 2015. The sharp price hikes — particularly for single-source generics — increased pressure on pharmacy retailers, who were caught between rising acquisition costs and limits on how much they could raise their own prices at the pharmacy counter. Compounding the squeeze: the frequent failure of MAC (maximum allowable cost)- and AMP (average manufacturer price)- based drug pricing models — and the payers that base their pharmacy reimbursements on them — to keep pace with the inflationary price spiral for some generics in their reimbursements to pharmacies for the medicines dispensed to their members.

Drug Store News, "Generic Drug Report 2016," (available at http://bit.ly/2iwpgzN, at 12).

61.    A 2015 white paper published by Elsevier Clinical Solutions reported the

following:

High generic drug prices have had an adverse effect on almost everyone in the pharmaceutical supply chain. Consumers face higher co-pays and prices and health plans are dealing with higher drug spend. Physicians are finding the need to prescribe alternative drug therapies while dealing with angry patients. In some cases, consumers are declining their medications due to increased prices. Many pharmacies are receiving inadequate reimbursements and can lose money when drugs must be purchased at rapidly rising prices but reimbursed at lower predetermined rates.

"The Impact of Rising Generic Drug Prices on the U.S. Drug Supply Chain," at 1-2, available at

http://bit.ly/1IuEiHo).

62.      Another 2015 white paper examining generic drug pricing, published by Wolters

Kluwer, explained:

> While the impact is being felt across the industry, small to mid-sized pharmacies
> can face notably greater challenges, as they do not have the resources,
> prescription volume, or affiliations with other purchasers that can empower them
> to bargain for discounts in a competitive marketplace. A survey conducted by the
> National Community Pharmacists Association (NCPA) revealed that pharmacy
> acquisition prices for many essential generic drugs have generally risen by
> between 600% and 1,000% in recent years. The same survey revealed that 84% of
> pharmacists at small or mid-sized pharmacies believed that increasing generic
> drug costs could result in unsustainable losses that would have a "very
> significant" impact on their ability to remain in business.

Donald J. Dietz, RPh, MS, and Fred Hamilin, "Generic Drug Pricing: Understanding the Impact,"

at 1-2 (available at http://bit.ly/2hnEq8q).

63.      Defendants' price-fixing scheme dramatically improved their profits, as

Levothyroxine was a major driver of both their revenues and their profits. For example, an

October 2013 Roth Capital Partners analyst report noted that "[t]he single largest revenue

contributor for Lannett is the levothyroxine franchise, which is currently in an environment with

limited generic competition." *See* Flash Note, Oct. 18, 2013, at 2 (available at

http://bit.ly/2hnI3LE). In Lannett's Q2 2014 Earnings Call on February 6, 2014 (just three

months after the first sharp price increase), CFO Martin P. Galvan cited Levothyroxine as one of

two "key products that are...driving our gross margin from a price increase perspective." *See*

*Lannett Management Discusses Q2 2014 Results - Earnings Call Transcript*, Feb. 6, 2014

(available at http://bit.ly/2hhhSmK).

64.      For Mylan, a much larger company than Lannett, Levothyroxine represented one

of the company's top ten generic drugs by revenue throughout the Class Period. According to

analyst estimates published by Susquehanna Financial Group, LLLP, Mylan's North America

revenues from Levothyroxine sales increased from less than $90 million in 2012, to $150 million in 2013, to $200 million in 2014, to $300 million in 2015.

65.　　In Mylan's Q2 2015 Earnings Call on August 6, 2015, Mylan's Chief Financial Officer John D. Sheehan cited "increased margins on existing [generic] products in North America," and noted "positive pricing in the North America," even as Mylan increased "mid-single-digit price declines in Europe... and low-single-digit price in the rest of world." *See Mylan (MYL) Earnings Report: Q2 2015 Conference Call Transcript*, at 6, 15 (available at http://bit.ly/2i0tuyk).

**D.　　The Levothyroxine Market is Conducive to an Effective Conspiracy.**

66.　　Characteristics specific to the market for Levothyroxine in the United States make it conducive to a price-fixing agreement.

67.　　**The Market is Highly Concentrated:** The domestic Levothyroxine market is highly concentrated. Three manufacturers substantially control the entire market.

68.　　**The Market has High Barriers to Entry:** Conspiracies that raise product prices above competitive levels will, all things being equal, attract to the relevant market new firms seeking to benefit from supracompetitive prices. But when barriers to entering the market are significant, new firms are less likely to do so. Barriers to entry thereby facilitate the maintenance of a price-fixing conspiracy. Significant barriers limit entry into the Levothyroxine market. Levothyroxine production is capital-intensive.

69.　　**Demand for Levothyroxine is Inelastic:** "Elasticity" is a term that describes the sensitivity of demand for a product to changes in its price. Demand is "inelastic" if an increase in its price results in a relativity small decline in demand for the product. Demand is inelastic in

markets—such as the Levothyroxine market—in which customers cannot readily substitute alternative products, or do without a product altogether.

70.     For competitors to profit from colluding to raise prices above competitive levels, demand for their product must be relatively inelastic at competitive prices. Otherwise, increased prices would reduce their sales as customers abandoned their products. Inelastic demand thus facilitates collusion.

71.     Demand for Levothyroxine is highly inelastic. A meaningful increase in the price for Levothyroxine would not induce purchasers to switch to another product in significant numbers, as the there is no reasonable substitute for Levothyroxine available at a lower price.

72.     **Levothyroxine is a Fungible Product:** Because all Levothyroxine is the same, price is the predominant factor driving customers' purchasing decisions. The interchangeability of Levothyroxine products facilitated Defendants' conspiracy by enabling coordination on price that would be more difficult if Defendants sold products that varied in composition and/or performance.

73.     **Defendants Had Ample Opportunities To Meet and Conspire:** Defendants had numerous opportunities to conspire in person under the guise of legitimate business meetings. In particular, Defendants are members of the GPhA, and attend other industry events and meetings, which provide opportunities to communicate. Defendants' representatives regularly attended meetings of GPhA, including the October 2013 meeting, and meetings of other trade associations during the Class Period. The DOJ is reportedly investigating trade associations like GPhA as a potential avenue for facilitating collusion among generic drug manufacturers as part of its ongoing investigation into anticompetitive pricing activities in generic drug markets.

**ANTITRUST INJURY**

74.     During the Class Period, Plaintiff and Class Members purchased Levothyroxine directly from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for Levothyroxine than they would have and thus suffered substantial damages. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

75.     Because Defendants' unlawful conduct has successfully restrained competition in the market, Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

76.     Defendants' anticompetitive conduct is ongoing, and as a result Plaintiff and the Class continue to pay supracompetitive prices for Levothyroxine.

**CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

77.     Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

78.     Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

79.     There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

80.     As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another as to the output and pricing of Levothyroxine in the United States. This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

81.     Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

82.     The conspiracy had its intended effect, as Defendants benefited from their collusion and the restraint of competition, both of which artificially inflated the prices of Levothyroxine, as described herein.

83.     As a result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for Levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

84.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.     Permanent injunctive relief that enjoins Defendants from violating the antitrust

laws and requires them to take affirmative steps to dissipate the effects of their violations;

      C.      That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

      D.      A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

      E.      By awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

      F.      The costs of this suit, including reasonable attorney fees; and

      G.      Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

      Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.


Dated: December 30, 2016                Respectfully submitted,

                                          _/s/ Linda P. Nussbaum_
                                     Linda P. Nussbaum
                                     NUSSBAUM LAW GROUP, P.C.
                                     1211 Avenue of the Americas
                                     40th Floor
                                     New York, NY 10036-8718
                                     (917) 438-9189
                                     lnussbaum@nussbaumpc.com

Juan R. Rivera Font
JUAN R. RIVERA FONT LLC
Ave. González Giusti #27, Suite 602
Guaynabo, PR 00968
(787) 751-5290
juan@riverafont.com

*Counsel for Plaintiff César Castillo, Inc.*
*and the Proposed Direct Purchaser Class*